Mrs. John A. FAIR, Administratrix of the Estate of John A. Fair, Deceased, Plaintiff,

v.

MISSISSIPPI VALLEY BARGE LINE CO., Defendant.

Civ. A. No. 63-C-14.

United States District Court
S. D. Texas,
Corpus Christi Division.

March 16, 1965.

Mandell & Wright, Sidney Ravkind and John N. Barnhart, Houston, Tex., for plaintiff.

Kleberg, Mobley, Lockett & Weil, R. W. Woolsey, Corpus Christi, Tex., for defendant.

GARZA, District Judge.

This action was brought by the Plaintiff as surviving widow and Administratrix of the Estate of John A. Fair, Deceased, against the owner and operator of the cargo vessel M/S TRANS–GULF for damages under the Texas Survival Statute, Art. 5525, Vernon's Ann.Tex. Civ.St., and the Jones Act, 46 U.S.C.A. § 688. Liability is predicated on Defendant's negligence which caused, at least in part, the illness and eventual death of Plaintiff's decedent who was a seaman working as an oiler aboard Defendant's vessel.

The case was tried before the Court, and the attorneys for the parties have submitted briefs.

The deceased was 46 years old at the time of his death on December 15, 1962. Earlier in 1962, John Fair had served as an oiler aboard the TRANS–GULF from May 31st until June 11th, and from July 26th until July 28th, working in the engine room of the vessel, checking and oiling various machinery and equipment. On these two occasions the vessel was engaged in discharging bauxite at the Reynolds Metals Company's port near Corpus Christi, Texas.

The engine room contained several levels connected by stairways or ladders, and the entire area was enclosed. There were doors for access to other parts of the ship, a skylight at the top, which could be opened to release hot air, and four forced-draft blowers which provided ventilation.

Although the testimony brought out that all ships' engine rooms are hot, it was further established that the engine room aboard the TRANS–GULF was unusually hot when the vessel was in port discharging bauxite.

A brochure printed by Defendant and introduced as an exhibit describes the TRANS–GULF as "introducing a new and unusual shipping service," in that it was equipped with discharging cranes and hoppers on its decks, and conveyors which encircled the ship, thus saving labor costs in discharging cargo.

The evidence showed that bauxite is an extremely dusty cargo, that the method used in discharging bauxite from the TRANS–GULF created a larger amount of very fine dust than if discharged in a regular manner, and that such dust, if allowed to enter the engine room in any appreciable quantity, would cause increased wear and great damage to the machinery therein. To combat the dust problem, Defendant's officers and crew kept the skylight and engine room doors closed when bauxite was being discharged, and turned off at least three of the four forced-draft blowers.

The evidence was conflicting on the exact range of temperatures within the various levels of the engine room, but there is no question that at all times while the vessel was in port it was extremely hot, generally running away above 100 degrees, and the "effective temperature" above the tolerable limits.

On June 11, 1962, the deceased became ill with chest pains and reported to the captain, who released him from the ship and made the entry in his log, "Reason for separation—medical relief—had a mild stroke about the heart just before the vessel sailed * * *" Fair made no request for transportation, but went ashore unassisted and apparently obtained transportation in a private vehicle to the hospital in Corpus Christi where he was treated by the Public Health Service and declared fit for duty on July 26th.

Defendant returned to the TRANS–GULF which had made a voyage in the

meantime and was back in port discharging bauxite again. He worked again as an oiler in the engine room until July 28th, when he again suffered severe chest pains diagnosed as angina pectoris, and was assisted by his engineering officer and a Union patrolman up the stairway to his quarters to lie down. Later he met the captain in a passageway and told him that he would have to leave the ship. Fair went to the captain's office later to receive his pay and was again separated, making no request for transportation, but again apparently obtaining a ride to the hospital where he was admitted and treated by the Public Health Service until his death on December 15th, resulting from a heart attack.

The medical testimony established that the myocardial infarction which caused Fair's death, was caused by a therosclerotic heart disease and a left bundle branch block.

It was established that John Fair had been an alcoholic, but had been cured for seven years before his death. He was a member of Alcoholics Anonymous and devoted a rather extensive part of his time to helping others with this problem.

■ Although it was established that Fair's heart disease had built up over a period of time, this Court finds that there was a causal connection between the working conditions aboard ship encountered by the deceased and the heart attack leading to his death. The fact that various activities unconnected with his employment caused some chest pain to the deceased, as testified to by Mrs. Fair, does not negate the causal connection between the final heart attack and the exertion of working and climbing stairs within an oppressively hot and poorly ventilated area.

■ The Court further finds that the working conditions which contributed in part to the illness and death of John Fair were unsafe as a result of Defendant's negligence in failing to provide proper ventilation for the engine room of the TRANS-GULF.

The great efficiency provided by the equipment aboard this vessel in discharging a cargo, was not matched by a ventilating system sufficient to maintain minimal conditions for working safely within the engine room.

■ Although John Fair's heart condition may have been unknown to any of Defendant's officers before his attack on June 11th, the master of the TRANS-GULF was certainly aware that he was having heart trouble from that time on. Therefore, I further find that the Defendant was negligent in failing to provide Fair with proper medical treatment, both at the time of his attack on June 11th and the subsequent attack on July 28th. Deceased was allowed to climb the stairs, leave the ship and make his way to a hospital, all without any assistance. See Downie v. United States Lines Co., 231 F.Supp. 192, D.C., E.D. Pa., 1964.

The parties adduced evidence showing the earnings of John Fair during the last few years of his life, the amounts contributed to his only beneficiary, Mrs. Fair, and the life and work expectancy of both an average person and a person with John Fair's heart condition.

■ After considering all of the above factors, as well as the increasing amount of time spent in gainful employment contrasted with that spent in personal and charitable pursuits, the probable earnings of deceased in the future, the amounts he would have contributed to his wife (discounted for present payment), and the loss of earnings attributable to Defendant's negligence from June 11th until John Fair's death, this Court finds that the actual pecuniary loss to Plaintiff is $18,000.00, plus funeral expenses of $1,737.00.

Therefore, judgment is this day being entered for Plaintiff in the amount of $19,737.00.

This Memorandum Opinion will constitute the Findings of Fact and Conclusions of Law of the Court.